IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JAMILA DAVIS,

      Petitioner,

vs.                                           Docket No.: 2:05-CR-0482-JLL

UNITED STATES OF AMERICA,

      Respondent.

_____/

**PETITIONER'S REPLY TO GOVERNMENT'S
OPPOSITION TO MOTION FOR NEW TRIAL**

    The Petitioner respectfully submits this Reply Brief in response to the government's Memorandum in Opposition to the Motion for New Trial pursuant to Fed. R. Crim. P. 33 and for the reasons stated below, this motion should be granted.

    The newly discovered evidence meets the five-prong standard set forth by the Third Circuit, hereby meeting the court's requirements to grant a new trial based on newly discovered evidence, which includes:

    (1)    The evidence must be in fact newly discovered; in essence, discovered since trial;

    (2)    The facts must be alleged from which the court may infer diligence on the part of the movant;

    (3)    The evidence relied on must be not merely commutative or impeaching;

    (4)    The evidence must be material to the issues involved; and

(5) The evidence must be such, and of such nature, on a new trial, the newly discovered evidence would probably produce an acquittal. See, (*United States v. Saada*, 212 F.3d 210, 216 (3rd Cir. 2000).

## STATEMENT OF FACTS

At trial, Nicholas Infantino, mortgage broker, testified that the Petitioner approached him in early 2002 for the securing of a mortgage and a construction loan to purchase and renovate a property at 497 Piermont Road in Cresskill, New Jersey. The government presented the original contract of sale that the Petitioner provided to Infantino as an exhibit. This contract showed that the Petitioner "herself" was listed as the purchaser of the property and the true purchase price of the property was disclosed. Infantino's testimony revealed the Petitioner's original intent to buy and renovate the property in her own name utilizing her own legitimate credentials.

Infantino further testified that he told the Petitioner that the only way to secure a mortgage that included additional funds for renovation was to have the seller involved in the transaction and have the contract price listed to be greater than the actual price of the property. Infantino explained to Petitioner how she could secure a mortgage facilitated by Lehman Brothers Bank who would easily issue a mortgage on a multi-million dollar transaction. Infantino further stated that Lehman Brothers Bank was the only bank which would allow the Petitioner to secure her own two appraisals, allowing the true purchase price of the properties to not be revealed.

Infantino also explained to Petitioner that she would need to find a "straw buyer" with a good credit score and what documents she would need to produce to have the loan approved. Infantino testified that Petitioner followed his directions and secured the "straw buyer" to purchase the property, and he ordered fraudulent documents to get the loan approved from a contact provided by the Petitioner named Albert Rodd.

Infantino further testified that he personally knew two representatives inside Lehman Brothers Bank named Chris Ridman, a loan officer, and Diane Bauer, an underwriter of all the loans. He testified that he would submit an application to them and then Bauer would fax back a "conditional approval" and tell him "what he needed to process the loan" including what needed to appear on the actual mortgage application, the bank statements, W2 statements, pay stubs and the contract of sale. Further testifying that he did not understand how the buyer for the 497 Piermon Road property was ultimately approved since a notation on one of the fax communications from Diane Bauer stated that the borrower's credit was not high enough. Infantino further admitted that Lehman Brothers Bank provided mortgage brokers with a set of guidelines as to what was "needed" for amount of income and assets required for each and every borrower prior to receiving the actual mortgage loan applications, giving the brokers a chance to change or alter the applications strategically to meet the bank's requirements.

Infantino further identified several documents from Diane Bauer which gave him instructions on what was needed in order to get the loans to go through.

Infantino further admitted that several "mistakes" were made on some of his submissions such as providing two conflicting sets of W2's which should have raised a "gigantic red flag" yet, the deals closed anyway. He also identified the same style pay stubs and W2's and the same employment used on multiple occasions for six "straw buyers" used to purchase the properties in question, some even included the same exact income and the same identical bank statements only differentiated by the straw buyer's name and bank account number.

Infantino testified that these clearly fraudulent documents all went to Diane Bauer for processing, who was the sole underwriter of all the fraudulent loans in the scheme. Despite the many problems and discrepancies that each loan file contained, Diane Bauer gave Infantino "ample chances" to fix the problems, which he did, and she directed, step-by-step, Infantino on how to get each loan approved and ready to close.

Testimony from Infantino also revealed the purchaser who was originally deemed un-credit worthy to purchase the first property, who bought the first property 497 Piermont Road in Cresskill for $2.1 million and was approved less than six months later to purchase an additional property in the same county for $ 2 million, even thought his job information W-2's were conflicting from the first application that was submitted. Bauer instructed Infantino through fax correspondences of what documents Infantino needed to produce to get the applicant who was at first un-credit worthy to purchase an additional property, leaving the "straw buyer" indebted to the bank for close to $4 million. Infantino's

4

testimony revealed the fact that he helped architect the elaborate scheme using the bank's criteria that he had been supplied by the banks underwriter.

Infantino also admitted he participated in this same style fraudulent scheme with others who the Petitioner did not know, or had contact with.

## THE NEWLY DISCOVERED EVIDENCE SUMMARY

(1) On September 15, 2008, Lehman Brothers Bank collapsed and the bank filed for Chapter 11 Bankruptcy protection following the massive exit of most of its clients, drastic losses in its stocks and evaluation of its assets, which revealed that the bank was over leveraged and almost insolvent. Lehman's demise was greatly attributed to the $ 25 billion debt the bank incurred in toxic residential mortgages.

(2) During the Lehman Brothers' Bankruptcy investigation, the court-appointed examiner Valukas, discovered that Lehman Brothers in fact participated in a pattern of deception and that the company knowingly created and participated in fraudulent activities related to their mortgage lending practices. These findings were documented in a 2,200-page document prepared by examiner Valukas.

(3) The Valukas Report revealed what it characterized as "materially misleading" accounting gimmicks that Lehman used to mask the perilous state of its finances that was certified by Richard S. Fuld, Lehman's former Chief Executive Officer and illustrated misconduct at Lehman, throughout its ranks, including at the highest executive levels.

Valukas exposed a letter to Lehman's auditors, Ernst and Young, from the former Senior Vice President of the Finance Division at Lehman who was in charge

of global balance sheets and legal entity accounting, Matthew Lee. Lee alleged unethical and illegal violations at Lehman in financial and accounting practices in his letter to Lehman's auditor. The letter revealed an accounting gimmick entitled, "Repo 105", which was used to temporarily remove debt off the company's balance to make Lehman seem less leveraged to potential investors. Subsequently, after Lee wrote this letter of concern to Lehman's auditors, he was ousted from the company.

Valuka's report revealed that the illegal "Repo 105" transactions were implemented in 2001, more than seven years before Lehman declared bankruptcy, and this illegal accounting was used to move up to $50 billion in debt off of Lehman's balance sheets temporarily to show it was not carrying too much debt. The accounting rule falsely showed debts as sales.

Even though Lehman's financial condition in 2001 was near insolvent, the accounting rule falsely showed potential investors that Lehman was in good financial condition. This caused Lehman to falsely induce investors to invest in the company.

(4) In April of 2010, Professor William Black a former government regulator and White Collar Criminologist, was asked to prepare a report for the house Committee on Financial Services to discuss public policy issues arising from Lehman's failure. Professor Black submitted a 24-page report which detailed Lehman's fraudulent conduct and patterns of deceit deeply rooted within the bank "itself." Professor Black also detailed the bank's purported fraudulent lending practices.

Professor Black's report identified that the main source of Lehman's fictional income was generated from Aurora Loan Services, a subsidiary of Lehman Brothers that specialized in Alt-A lending. <u>Alt-A loans are for people with less that A credit, but specifically greater than subprime lending credit.</u>

The Black report revealed that Lehman masked the financial state of the company, and its fraudulent lending practices in order to keep the bank afloat avoiding prosecution. The report also revealed numerous incidents of insider fraud that was routinely covered up by Lehman.

Professor Black decreed that Lehman was an architect of mortgage fraud that recruited "small frys" to provide them with fraudulent loan applications that they would approve without checking the validity of the information listed on the applications. Professor Black's evidence proved Lehman Brothers Bank "itself" knowingly engaged in fraud and purposely approved loans which the bank knew contained false information.

(5) On September 4, 2008, Michael Walker, a high-risk specialist for Aurora Loan Services, LLC, Littleton, Colorado was fired after he violated the company's privacy policy by speaking to the FBI about mortgage fraud within the company.

Subsequent to his dismissal he filed a lawsuit in the Denver District Court which alleges that Lehman's mortgage subsidiary, Aurora Loan Services, LLC, wanted to remain profitably unaware of fraud.

In Walker's complaint, he detailed several instances which supported that management encouraged and promoted approving deals that the bank knew

contained false information. Walker's allegations and supporting evidence exhibited the culture of fraud that the bank engaged in by recollecting his day-to-day experience as a high-risk loan specialist and other acts of fraud internally witnessed by him within the company. Walker illustrates that Lehman Brothers Bank "itself" promoted, encouraged, created, and rewarded fraudulent participation in mortgage fraud. They were the architects.

<u>ISSUE ONE</u>

<u>The evidence in the Petitioner's Rule 33 Motion is in fact newly discovered; in essence, discovered since trial.</u>

All five pieces of newly discovered evidence presented in the Petitioner's Rule 33 Motion were discovered or revealed that in 2008 or thereafter, which was a year or more after her trial that took place in September of 2007. Even with grand due diligence, this information could not be discovered or foreseen because the new evidence reveals that Lehman purposely and skillfully masked the internal fraud within their organization for financial gain and to avoid prosecution, as quoted by the court appointed bankruptcy trustee Valukas. In addition, anyone who threatened to violate the company's privacy policy was quickly fired and the company kept tight scrutiny on the information available to the public. Not even the FBI was able to gain intelligence about Lehman's deceptive fraud. Had the FBI known the extent of Lehman's deception, they could have stopped or deterred the company from victimizing thousands of investors causing a worldwide financial frenzy.

Lehman's fraud was so well masked that not even skillfully trained SEC regulators could detect the bank's deceptive accounting practices that root back as far as 2001. If the FBI and the SEC could not detect Lehman's fraud the Petitioner could not have possibly known the extent of the fraud that constituted the very basis of the bank "itself." Therefore, the government improperly portrays that the Petitioner knew before trial about the extent of Lehman's fraud. The Petitioner knew only that Infantino had an inside connection inside Lehman, who was helping him structure each deal by telling him exactly what he needed to show to get each deal closed, despite the huge discrepancies in the loan files.

Petitioner's counsel attempted to portray Lehman's bad practices by introducing the allegations that were just made public at the time of trial which suggested that Lehman Brothers Bank was possibly involved in unethical subprime lending. Counsel's attempt failed because the loans in the Petitioner's case were *not* subprime.

The new evidence reveals that the majority of Lehman's mortgage lending fraud and their biggest income producing company was Aurora Loan Services, who was the same company that funded the Petitioner's deals. Aurora specialized in Alt-A loans, not subprime. All the loans in the Petitioner's case were Alt-A. Counsel never mentioned any facts in the Petitioner's case at trial which questioned Aurora's lending practices of Alt-A loans, nor did counsel know about the internal fraud in Aurora, which was later identified in Michael Walker's Denver District Court lawsuit.

Had counsel known about this information, or if this information was available, he could have used it to counter the testimony of Carl Peterson who testified that the bank would not have funded the deals had they known that the deals contained fraudulent information. In fact, given the intolerance of Lehman towards revelation of factions by its employees as described by the newly discovered evidence, the integrity of Carl Peterson's testimony would credibly be attacked.

Therefore, the government's argument that Petitioner's discussion during trial about Lehman's subprime loan business practice has nothing to do with the newly discovered information is misplaced. The newly discovered information reveals Aurora Loan Services and Alt-A lending practices of Lehman which is the entity and the loan type that directly relates to the Petitioner's case. Accordingly, the newly discovered information is in fact "newly discovered."

The government relied on case law in the opposition brief attempting to prove that if it was known to the defendant during trial, or if the defendant had constructive knowledge of the evidence during trial, it is not considered newly discovered evidence. The government incorrectly says that the Petitioner's counsel's inference of Lehman's subprime lending practices at trial is the basis of the newly discovered evidence. Again, the newly discovered evidence is not about any subprime practices of lending by Lehman. The new evidence is all based on the culture of fraud inside Lehman itself and the fraudulent lending practices of Lehman's subsidiary, Aurora, who specialized in <u>Alt-A</u> lending (not subprime), who

have now been shown to have up to 90% of its loan files contain fraudulent information.

The newly discovered evidence is new and could not have been discovered by the Petitioner, even with ultimate due diligence.

ISSUE TWO

<u>The facts of the newly discovered evidence which the court may infer diligence on the part of the movant.</u>

The Petitioner contends she went to trial to show her true culpability in the offense and to illustrate that internal fraud within Lehman Brothers played a major part in making the scheme successful. Petitioner did her best to expose what she knew about the fraud scheme that she was involved in. The Petitioner had no idea that the entire bank itself was a perpetrator of fraud, nor did she have knowledge that the majority of Aurora's Loan files contained fraud, as revealed in the bankruptcy findings of Lehman and illustrated in Black's report.

Therefore, the Petitioner did the best she could do in revealing the facts she knew through her co-conspirators at trial to illustrate the minor role that she played in the scheme. The questioning proved she did not discover the scheme, nor was she the architect of the scheme. The Petitioner went to Infantino, a mortgage brokerage owner, looking for a construction loan for a property she wanted to personally buy and renovate the properties. He advised her of a way he could structure the deal and get it approved with the help of his inside Lehman contacts. Infantino admitted during trial that he also told the Petitioner this was the only

11

way he knew she could obtain the funding for renovations on a multi-million dollar property.

The Petitioner had no way of interviewing Lehman employees because it was against the company's privacy policy for Lehman staff to reveal any information or the practices of the company, even to law enforcement or the FBI.

Accordingly, the Petitioner did as much due diligence as she could to reveal the facts of her case. The fact that the extent of Lehman's fraud shocked the federal government and the financial community after its demise underscores the difficulty of discovery of the newly discovered information.

ISSUE 3:

The evidence relied on is not merely commutative or impeaching.

The newly discovered evidence is crucial to the defense of the Petitioner and not merely commutative or impeaching, because it shows that Petitioner did not defraud Lehman Brothers Bank as required to be convicted of bank fraud according to Title 18 U.S.C. § 1344.

The Petitioner was charged with bank fraud and conspiracy to commit bank fraud pursuant to Title 18 U.S.C. § 1344. According to Title 18 U.S.C. § 1344 Petitioner must knowingly deceive or defraud a federally chartered or insured financial institution. "It is the financial institution itself – not its officers or agents – that is the victim of the fraud 18 U.S.C. § 1344(1) prescribed." (*United States v. Saks,* 964 F.2d 1514) (5th Cir. 1992).

Accordingly, under Title 18 U.S.C. § 1344, the bank itself must be a victim of the fraud. The newly discovered evidence proves that the bank itself was permeated by a culture of fraud and deceptive lending practices and that the bank itself participated, engaged and even developed fraud schemes, disqualifying them to be considered a victim according to Title 18 U.S.C. § 1344. A victim, pursuant to this statute, cannot also be a participant.

The history of statute 1344 reveals the intent of Congress in the creation of the Bank Fraud statute, "the offense of bank fraud in this part is designed to provide an effective vehicle for the prosecution of frauds in which the victims are financial institutions that are federally created, controlled or insured." S. Rep. No. 225,, 98th Cong., 1st Sess. 377 (1983), reprinted in 1984 U.S. Code Cong. And Admin. News 3182, 3517 (emphasis added). The House report similarly states that this section is concerned with "fraudulent schemes where banks are victims." H.R. Rep. No. 901, 98th Cong., 2d Sess. 2   1984)" (*United States v. Blackman,* 839 F.2d 900) (2d Cir. 1987)

Therefore, for one to be convicted of bank fraud, the government must prove beyond a reasonable doubt that the perpetrator defrauded or duped the bank into engaging into fraud. A bank whose primary revenue is derived from fraudulent activities, that are known to be fraudulent by the bank itself, cannot be considered an entity that is a victim that was duped or deceived. The bank itself was the product of, promoted and encouraged fraud.

Therefore, this newly discovered evidence is crucial in showing that the Petitioner did not violate Title 18 U.S.C. § 1344 because she did not defraud the bank, according to the law. She participated in the common deceptive patterns that the bank had constructed to recruit others, "small frys." This was done by offering great incentives and financial rewards for both the bank itself and its co-conspirators, the "small frys."

The newly discovered evidence proves that the defendant's misconduct was not correctly assessed according to the legal standards of 18 U.S.C.S. 1344, and therefore her conduct did not constitute bank fraud.

ISSUE 4:

<u>The new evidence contains issues that are material to the issues involved</u>.

The new evidence reveals the character and deceptive lending patterns of the bank, particularly of Aurora Loan Services and its <u>Alt-A</u> lending practices.

These issues were the primary focus of the Petitioner's case and directly address the role that she played in the scheme that was brought to the attention of the U.S. Attorney by the "alleged victim."

The evidence shows the "alleged victim" was not a victim at all but the perpetrator and architect of a deceptive lending scheme which ultimately caused the collapse of the bank itself, and indeed the world economy.

The evidence reveals that the bank was calculating and deceptive in masking its wrongdoing by acts such as blaming others and ostracizing anyone who threatened to reveal their scheme.

The evidence further reveals the key factors necessary to show the victim was not a victim at all. The "victim" was the actual perpetrator who victimized thousands, if not hundreds of thousands, of others by its patterns of deceit.

ISSUE 5:

The newly discovered evidence is of such nature, as that, on a new trial, the newly discovered evidence will probably produce an acquittal.

According to Title 18 U.S.C. § 1344 the government had to prove beyond a reasonable doubt that the bank was defrauded. The newly discovered evidence so overwhelmingly shows Lehman's fraudulent intentions and activities that the Petitioner would be acquitted at a new trial.

During the Petitioner's trial, the government argued that if Lehman had known the paperwork in the loans were fraudulent, they would not approve the loans. *The newly discovered evidence contradicts that claim.*

The newly discovered evidence shows that the bank itself falsified its own accounting records to induce others to invest in the company. The evidence also shows that the bank made its greatest income from packaging and selling mortgage loans. The bank stood to receive up to 30 times the face value of the loans they funded in borrowing borrower when they sold the loans on the market. The bank also knew up to 90% of the mortgage loans it was selling contained fraud, and the bank was in a perilous financial condition during the time the bank funded the loans in the Petitioner's scheme.

15

The jury would be compelled to recognize these factors in determining whether or not the bank was actually defrauded, as contended by the government. The question the jury would have to assess would be: would a known group of major fraudsters, who participated and innovated fraudulent schemes for profit, perpetrate a scheme to lend $ 23 million which would generate up to $ 690 million in borrowing power for their near insolvent bank?

The factors alone in the newly discovered evidence, which illustrate the clear pattern of deceit within the bank itself, would raise reasonable doubt in the Petitioner's case producing an acquittal.

Trial evidence further pointed out the unexplainable communications between Bauer and Infantino, in which Bauer lead, helped, and instructed Infantino how to get each loan funded, despite huge red flags in each loan file. That evidence along with the new evidence would convince a reasonable person, *i.e.* jury member, the bank itself perpetrated and maintained the fraud, creating reasonable doubt for the government's case in chief.

Lastly, Michael Walker's testimony would have refuted the testimony of Carl Peterson, Lehman's representative at trial, and showed that the bank itself encouraged and promoted underwriters and loan specialists like himself, to participate in fraud. Indeed, Peterson's integrity as a witness would easily be challenged.

This compendurm of extremely credible evidence would have caused the jury to view Lehman for what it was; "a bank that was a 'control fraud'." "Control fraud"

is a criminology term that refers to situations in which the persons controlling a seemingly legitimate entity uses it as a "weapon." (Quoted by William Black in his report on p. 5). The jury would have to answer the final question, "How could a bank be a victim when it has been discovered that they in fact victimized the world economy with its collapse due to lying and deceptive financial and lending practices? A jury would be compelled to find the Petitioner not guilty based on the overwhelming favorable newly discovered evidence, casting reasonable doubt on the government's charges against her.

Finally, the government points to Commerce's Bank's loss in the scheme, claiming their business had no involvement with the issuing of subprime loans which has nothing to do with the Petitioner's argument within her Rule 33 Motion. The Petitioner contends that trial showed Commerce Bank had no signed loan applications on file. The bank, therefore, lent over $5 million, without one signature that verified the legitimacy of the information on the mortgage applications.

Absent the borrower's signature, the bank legally could not hold the borrower responsible for providing false information under the penalty of perjury as required by a signed mortgage loan application. Particularly in light of the evidence about Lehman, Commerce's lack of banking controls would cast reasonable doubt on the government's case.

With the overwhelming evidence of Lehman's foul play and evidence of Commerce's lax mortgage approval process, a jury would also doubt Commerce's

17

banking practices and construe knowing involvement in the fraud, particularly since Infantino testified he also had a direct relationship with a senior vice president within Commerce Bank.

The newly discovered evidence compounded with the evidence at trial that high executives within Commerce were charged in Pennsylvania Federal Court for lending favors, lending to those who did not qualify for loans, as admitted by Jeffrey Burley, Commerce' representative at trial, would further cast doubt on Commerce' participation in the scheme.

Accordingly, the newly discovered evidence would also raise red flags to the involvement and participation of Commerce Bank "itself," creating reasonable doubt that it was defrauded according to 18 U.S.C.S. 1344 standards.

## CONCLUSION

For all the following reasons listed in the Petitioner's Rule 33 Motion, the Petitioner's conviction should be reversed and she should be granted a new trial based on newly discovered evidence.

The Petitioner respectfully requests that an evidentiary hearing be held to assess the depth of the newly discovered information that was exposed in the Lehman's Brother's bankruptcy findings.

The bankruptcy report consists of 2,200 pages which the Petitioner has not been able to examine and perhaps consists of even more critical and exculpatory evidence that supports the Petitioner's claims. The Petitioner is representing herself pro se and she is incarcerated, limiting her access to the voluminous

information now exposed in the 2,200-page bankruptcy report. Therefore, in the interest of justice, the Petitioner also respectfully requests that counsel be appointed to review the newly discovered evidence in depth to determine if there are any other key pieces of exculpatory or crucial new evidence that supports her claims listed in this motion.

Done this ⎵⎵ day of January 2011

                                                    Jamila Davis
                                                    Register No. 59253-053
                                                    Danbury Correctional Institution
                                                    33 ½ Pembroke Road
                                                    Danbury, CT 06811

## CERTIFICATE OF SERVICE

I HERBY DO CERTIFY that a true and correct copy of this pleading was mailed to: United States Attorney's Office, District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102 by placing the same in the Federal Prison's Legal Mail Box, with sufficient First Class Postage.

Done this ⎵⎵, day of January 2011

                                                    Jamila Davis
                                                    Register No. 59253-053
                                                    Danbury Correctional Institution
                                                    33 ½ Pembroke Road
                                                    Danbury, CT 06811